## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER PAUL, | |
| Plaintiff, | No. 14-cv-03259 |
| v. | Judge John F. Kness |
| CHICAGO TRANSIT AUTHORITY, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christopher Paul, a bus driver fired by Defendant Chicago Transit Authority, brought this three-count action against Defendant for failure to accommodate his qualifying disability, retaliation, and interference with his rights under the Americans with Disabilities Act, 42 U.S.C. § 12111 *et seq*.[1] Before the Court are Plaintiff's Motion for Reconsideration (Dkt. 132) of the Court's earlier order dismissing with prejudice his failure to accommodate claim (Dkt. 106) and Defendant's Motion for Summary Judgment as to Plaintiff's remaining claims for retaliation and interference (Dkt. 147). For the reasons that follow, Plaintiff's Motion for Reconsideration is denied, and Defendant's Motion for Summary Judgment is granted.

---

[1] The Court has subject matter jurisdiction in this federal-question case under 28 U.S.C. § 1331. Citations to the parties' statements of facts are "DSOF" for CTA's Rule 56 Statement (Dkt. 149), "PSOAF" for Plaintiff's Rule 56 Statement (Dkt. 155), "Pltf. Resp. DSOF" for Plaintiff's Response to Defendant's Statement of Facts (Dkt. 156), "Def. Resp. PSOAF" for Defendant's Response to Plaintiff's Statement of Additional Facts (Dkt. 168).

## I.    BACKGROUND

At the summary-judgment stage, the Court views the facts in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). That said, nonmoving parties offering factual assertions in defense of their claim must support those assertions with evidence and may not rely on allegations in their complaint. *Estate of Perry v. Wenzel*, 872 F.3d 439, 461 (7th Cir. 2017). The following recitation of facts reflects these principles.[2]

Plaintiff worked as a CTA bus driver from January 15, 2007 to December 11, 2012. (DSOF ¶ 3; Pltf. Resp. DSOF ¶ 3.) Plaintiff worked part-time and without a set schedule for most of his tenure. (DSOF ¶ 6, 9; Pltf. Resp. DSOF ¶ 6, 9.) On his assigned workdays, he reported to the Kedzie Garage in the East Garfield Park neighborhood of Chicago, where he was dispatched to a route by the managers on duty. (DSOF ¶ 10; Pltf. Resp. DSOF ¶ 10.)

As a union employee, Plaintiff was subject to Defendant's Corrective Action Guidelines.[3] (DSOF ¶¶ 3, 12, Ex. F; Pltf. Resp. DSOF ¶¶ 3, 12.) These guidelines

---

[2] Plaintiff is the nonmoving party, yet paragraphs 6, 7, and 8 of his "Statement of Additional Facts" (Dkt. 155) cite nothing but his complaint. Moreover, paragraphs 6, 12, 17, 60, 61, 62, 63, 64, 66, 67, and 68 are excessively long and rife with improper argumentation. *Cf. Malec v. Sanford*, 191 F.R.D. 581, 583-86 (N.D. Ill. 2000) ("the numbered paragraphs should be short; they should contain only one or two individual allegations. . . . [The Rule 56 statement] is not intended as a forum for factual or legal argument"). And paragraphs 41, 49, 51, 60, 61, 62, 63, 64, 66, 67, and 68 are not supported by any citation to the record and are therefore nullities. *Id*. ("[f]actual allegations not properly supported by citation to the record are nullities."). Ultimately, the Court was able to parse the record, and the outcome was not determined by these errors.

[3] In his response to CTA's statement of facts, Plaintiff claims the fact that he was subject to the Corrective Action Guidelines as a bargained-for employee is "not traversable" because the CTA did not define the term "bargained-for employee." (Pltf. Resp. DSOF ¶ 12.) The Court is not sure what exactly Plaintiff finds himself unable to traverse. In any case, Plaintiff states

state that a driver who "fails to report at his or her starting time will be charged with a MISS." (DSOF ¶ 16; Pltf. Resp. DSOF ¶ 16.) They further provide that misses result in the following disciplinary progression:

> **First Miss**: Written Warning
> **Second Miss**: Final Written Warning and One-Day Suspension
> **Third Miss**: Corrective Case Interview/Probation and Three-Day Suspension
> **Fourth Miss**: General Manager Referral with Recommendation of Discharge

(*Id.*) At the "Corrective Case Interview/Probation" stage, a manager prepares an action plan that applies for the duration of a six to twelve-month probationary period. (DSOF ¶ 17; Pltf. Resp. DSOF ¶ 17.) The guidelines state that misses during the probationary period may result in termination. (*Id.*; DSOF Ex. F.)

In 2011 and 2012, Plaintiff missed multiple assignments for which he was disciplined (though not precisely in accordance with the progression set forth in the guidelines):

> **First Miss**: On April 19, 2011, Plaintiff missed an assignment and received a Final Written Warning and one-day suspension. (DSOF ¶ 37; Pltf. Resp. DSOF ¶ 37.)
> **Second Miss**: On October 1, 2011, Plaintiff missed another assignment and received another Final Written Warning and one-day suspension. (DSOF ¶ 39; Pltf. Resp. DSOF ¶ 39.)
> **Third Miss**: On November 19, 2011, Plaintiff missed again and received yet another Final Written Warning and one-day suspension. (DSOF ¶¶ 43, 46; Pltf. Resp. DSOF ¶¶ 43, 46.)
> **Fourth Miss**: On June 18, 2012, Plaintiff missed an assignment, which resulted in a three-day suspension. (DSOF ¶ 51; Pltf. Resp. DSOF ¶ 51.) In addition, a manager (James Lachowicz) performed a Corrective Case Interview and informed Plaintiff that he would be on probation for six months, until

---

that he was a union employee for the duration of his employment at CTA, and he does not claim—nor is there any indication in the record—that he was not subject to the Corrective Action Guidelines. (*See* Pltf. Resp. DSOF ¶ 3.)

December 26, 2012.  (*Id.*)

On November 23, 2012, during the probationary period, Defendant's electronic "Time Tap" time-entry system indicated Plaintiff had arrived twelve minutes late to work. (DSOF ¶ 68; Pltf. Resp. DSOF ¶ 68.) Lachowicz referred Plaintiff to the General Manager of the garage, Joseph Fitzgerald, with a recommendation for discharge. (DSOF ¶ 70; Pltf. Resp. DSOF ¶ 70.) On December 11, 2012, Fitzgerald discharged Plaintiff, citing his repeated misses and the November 23, 2012 probation violation. (DSOF ¶ 71; Pltf. Resp. DSOF ¶ 71.)

If Defendant were telling it, this would be the whole story. And although Plaintiff admits every word of that story is true, he says it is nothing more than a Potemkin village. (Dkt. 158 at 1-2.) According to Plaintiff, his termination was not the culmination of repeated missed assignments; it was the culmination of a prolonged campaign to deny him his legal rights under the ADA. (*Id.*)

Plaintiff is a qualified individual under the ADA because he suffers from bi-polar disorder. (PSOAF ¶ 32, Ex. 18.)[4] Part of the treatment for bi-polar disorder is a consistent sleep schedule. (PSOAF ¶¶ 9, 11, Exs. 2-3.) Plaintiff wanted his work schedule to accommodate this need. But, according to Plaintiff, Defendant did

---

[4] Plaintiff does not cite evidence in support of his claim that he is a qualified individual under the ADA. Although CTA does not expressly admit or deny that Plaintiff is a qualified individual under the ADA, it does not press the issue either. Viewing all facts in the light most favorable to Plaintiff, as the Court must as this stage, the Court assumes without deciding Plaintiff is a qualified individual.

everything it could to deny him this accommodation, then fired him for having the temerity to ask for it. (Dkt. 158 at 1-2.)

Plaintiff first notified Defendant of his need for consistent sleep on February 8, 2010. (PSOAF ¶ 9, Ex. 2; Def. Resp. PSOAF ¶ 9.) On that day, Plaintiff sent a letter from his physician, Dr. David Schilling, to Paula Wright, an employee in Defendant's human resources department. (*Id*.) The letter explained that Plaintiff was afflicted with an "illness" part of the treatment for which was "consistent sleep"; specifically, Dr. Schilling wrote that it would be "better for him to be able to go to bed at the about [*sic*] same time each night and to be able to get 7-8 hours of sleep each night." (*Id*.) More than a year later, on May 16, 2011, Plaintiff sent Wright another letter from Dr. Schilling. (PSOAF ¶ 11, Ex. 3; Def. Resp. PSOAF ¶ 11.) The second letter was similar to the first, but it, unlike the first letter, included a specific request that Plaintiff's work schedule be adjusted to accommodate his needs. (*Id*.)

Later that month, Plaintiff met with a benefits coordinator for Defendant, which resulted in Plaintiff's first accommodation request (the "FAR"). (PSOAF ¶ 12; Def. Resp. PSOAF ¶ 12.) On August 17, 2011, Defendant granted the FAR and agreed that Plaintiff would "not be required to work more than two pieces of work per day" and his shifts would be scheduled "a minimum of thirteen hours" apart. (PSOAF ¶ 16; Def. Resp. PSOAF ¶ 16; DSOF Ex. Q.)[5] The term of the agreement was one year. (PSOAF ¶ 15; Ex. 5; DSOF Ex. Q.) Over the course of that year, however, Defendant

---

[5] A "piece" of work seems to be CTA parlance for a shift. (DSOF Ex. Q.)

scheduled Plaintiff's shifts less than thirteen hours apart on approximately ten occasions. (PSOAF ¶ 17; Def. Resp. PSOAF ¶ 17.)

On August 3, 2012, Plaintiff transferred from part-time to full-time, pending medical clearance. (DSOF ¶ 6; Pltf. Resp. DSOF ¶ 6.) Though Defendant did not initially suggest Plaintiff was unfit for duty, he was soon referred for medical examination, during which time he was held out of work as unfit for a period of three workdays. (PSOAF ¶¶ 18-20.)

It then came time to renew the FAR agreement. On August 9, 2012, Dr. Schilling sent a letter to Anna Cobb, Defendant's Manager of Benefits Compliance, requesting that Defendant accommodate Plaintiff's need for a consistent sleep schedule. (PSOAF ¶¶ 4, 21; Def. Resp. PSOAF ¶¶ 4, 21.) Around the same time, Plaintiff submitted his second accommodation request (the "SAR"), citing Dr. Schilling's letter as support. (PSOAF ¶ 22; Def. Resp. PSOAF ¶ 22.) On August 22, 2012, a three-person committee—Kim Morris (Manager of Administration for the Office of the Vice President), Larry Wall (General Manager, Benefit Services), and Cara Levinson (Manager, ADA Compliance Program)—met to review the SAR, but the committee did not reach a determination at that time. (PSOAF ¶¶ 27-28; Def. Resp. PSOAF ¶¶ 27-28.) The review meeting was eventually rescheduled for September 19, 2012. (PSOAF ¶ 34; Def. Resp. PSOAF ¶ 34.)

The committee did not meet on September 19, 2012. (*Id*.) Instead, on September 20, 2012, Cobb requested that Plaintiff submit to a medical review. (PSOAF ¶ 35, Ex. 20; Def. Resp. PSOAF ¶ 35.) The same day, Defendant found

Plaintiff unfit for duty because he was taking Lithium, which causes drowsiness. (PSOAF ¶ 36, Ex. 21; Def. Resp. PSOAF ¶ 36.) Plaintiff was instructed that he "[m]ust obtain clearance and documentation from [a] private physician" before returning to work. (PSOAF ¶ 36, Ex. 22; Def. Resp. PSOAF ¶ 37.) Dr. Schilling exchanged correspondence with Defendant, including a September 24, 2012 letter attesting to Plaintiff's fitness for duty and reiterating his need for a schedule that would allow him to have a consistent sleep routine. (PSOAF ¶ 47, Ex. 28; Def. Resp. PSOAF ¶ 47.) On September 28, 2012, Plaintiff was reinstated. (PSOAF ¶ 46, Ex. 27; Def. Resp. PSOAF ¶ 46.)

On the same day Defendant reinstated Plaintiff, the committee met and decided to deny the SAR. (PSOAF ¶ 47; Def. Resp. PSOAF ¶ 47.) CTA provided Plaintiff with a letter explaining the committee's decision, which reads, in its entirety:

> The Accommodation Committee has evaluated your request received on or about August 12, 2012 for a "consistent" schedule due to your medical condition. Based on the facts presented to the Committee, your request is denied because the information the Committee has received does not support your accommodation request. If you have any questions, please contact Anna Cobb. . . .

(PSOAF ¶ 48, Ex. 29; Def. Resp. PSOAF ¶ 48.)

In addition to deliberations among the three voting committee members (Morris, Wall, and Levinson), Defendant's internal communications show Morris discussed Plaintiff's accommodation request with her direct supervisor, Bernard Jackson (Defendant's Vice President of Bus Operations). (PSOAF ¶¶ 2, 24; 27, Ex. 13,

19 Def. Resp. PSOAF ¶¶ 2, 24, 27.) These communications suggest Jackson was inclined to deny the SAR from the beginning. Before the first committee meeting on August 22, 2012, Morris wrote that Jackson was "not willing to grant an accommodation and give [Plaintiff] a set schedule as a full timer." (PSOAF Ex. 13.) Later, when Plaintiff asked whether he would be paid during the period when he was declared unfit, Jackson wrote to Morris: "Now since his plot to get accommodation has not worked. He is concern [*sic*] about getting paid now that he is found unfit and must file [a disability] claim. I guarantee he will make a recovery soon." (PSOAF Ex. 25.) Morris responded that she agreed. (*Id.*)

After the SAR was denied and Plaintiff was reinstated, Plaintiff continued to work, but there was no further resolution of the issue in October or November 2012. (DSOF ¶ 65; Pltf. Resp. ¶ 65; PSOAF ¶¶ 50, 52-53, Exs. 30-31.) Then, on November 23, 2012, Defendant's electronic "Time Tap" records reflected that Plaintiff had arrived twelve minutes late for work. (DSOF ¶ 68; Pltf. Resp. DSOF ¶ 68.) Plaintiff says he tapped in on-time and then spoke with the clerk, who told him he did not have to work that day. (Pltf. Resp. DSOF ¶ 68.) Plaintiff then tapped the system a second time on his way out, approximately twelve minutes after his shift was scheduled to begin. (*Id.*) Plaintiff asserts that the Time Tap system is known to malfunction, which explains why it registered the second tap but not the first. (*Id.*)

On December 11, 2012, Defendant terminated Plaintiff's employment. (Pltf. Resp. DSOF ¶ 71.) Although Defendant informed Plaintiff he was fired for repeated

misses, Plaintiff contends that reason was pretextual and that the real reason was to retaliate against him for pursuing an ADA accommodation. (PSOAF ¶ 64.)

## II.  PROCEDURAL HISTORY

Plaintiff submitted an EEOC charge on August 6, 2013. (PSOAF ¶ 65.) Plaintiff was given a 90-day right-to-sue letter, and he timely filed this lawsuit *pro se* on May 5, 2014. (Dkt. 1.) Plaintiff alleges (1) failure to accommodate; (2) retaliation; and (3) interference with his rights under the ADA, 42 U.S.C. § 12111 *et seq*. (*Id*.)

Defendant moved to dismiss all three claims. (Dkt. 20.) With respect to the failure to accommodate claim, Defendant argued the claim was time-barred and that Plaintiff failed to allege he had a disability within the meaning of the ADA. (Dkt. 21.) By the previously assigned judge, the Court recruited counsel for Plaintiff and allowed Plaintiff to file an amended complaint. (Dkt. 25.) Defendant filed a renewed motion to dismiss advancing the same arguments it raised in its initial motion. (Dkt. 32.) The Court dismissed the failure to accommodate claim without prejudice on the ground that Plaintiff had failed to allege he had a disability within the meaning of the ADA. (Dkt. 106.) But the Court also permitted Plaintiff's retaliation and interference claims to proceed. (*Id*.)

To revive his failure to accommodate claim, Plaintiff filed a Second Amended Complaint. (Dkt. 65, 70.) Defendant moved to dismiss again. (Dkt. 66-67.) On March 19, 2018, the Court dismissed with prejudice Plaintiff's failure to accommodate claim and held that it was time-barred. (Dkt. 106.) The Court observed that Plaintiff

received a letter unequivocally denying his accommodation request on September 28, 2012, yet he failed to file an EEOC charge within 300 days of that date. (*Id.*)

On April 30, 2018, Plaintiff moved to compel Defendant to comply with its discovery obligations, alleging Defendant failed to turn over what would turn out to be more than 180,000 responsive documents. (Dkt. 109.) The Court granted the motion and ordered Defendant to produce the documents to Plaintiff. (Dkt. 111.) Plaintiff, citing newly discovered evidence from the compelled document production, now asks the Court to reconsider its dismissal with prejudice of his failure to accommodate claim. (Dkt. 132.)

For its part, Defendant moves for summary judgment with respect to Plaintiff's retaliation and interference claims. (Dkt. 147.) That motion is now both fully briefed and argued. (Dkt. 161; 170; 187.)

## III. DISCUSSION

### A. Plaintiff's Motion for Reconsideration

Plaintiff argues that newly discovered evidence from Defendant's compelled document production warrants resurrecting the failure to accommodate claim this Court previously dismissed with prejudice. (Dkt. 132.) Before turning to the merits of Plaintiff's argument, the Court must first determine the appropriate standard of review for the motion.

#### 1. Standard of Review

Although the Court previously dismissed Plaintiff's failure to accommodate claim with prejudice, the Court has the power to reinstate that claim. *See Haag v.*

*Cook Cnty. Adult Prob.*, No. 17-cv-05403, 2019 WL 1619971, at *2 (N.D. Ill. Apr. 16, 2019) (courts "may reconsider an order that 'adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties [in a case] . . . at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities'") (quoting Fed. R. Civ. P. 54(b)). Seeking that result, Plaintiff filed a motion for reconsideration of the Court's dismissal order. (Dkt. 132.) But then, at a status hearing, Judge Wood suggested that the Court would consider Plaintiff's motion as one for leave to amend. (Dkt. 137; Dkt. 186.) Urging that path, Plaintiff in reply argues that the Court should apply the standard for amending pleadings under Rule 15 of the Federal Rules of Civil Procedure, rather than the standard for assessing motions for reconsideration under Rule 54. (Dkt. 141 at 2.) This colloquy has resulted in significant confusion as to which standard of review should apply to Plaintiff's motion. *Cf. Lone Star-Cardinal Motorcycle Ventures VII, LLC v. BFC Worldwide Holdings, Inc.*, No. 16-cv-02102, 2016 WL 6248185, at *2 n.3 (N.D. Ill. Oct. 26, 2016) ("The combination of the motion to reconsider and motion for leave to amend has led to a confusing morass of arguments. . . .").

Although it is true that courts must analyze motions for leave to amend under Rule 15 where "the district court has taken the unusual step of entering judgment at the same time it dismisses the complaint[,]" *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 521 (7th Cir. 2015), that rule does not apply here. When the Court dismissed Plaintiff's failure to accommodate claim with prejudice, the Court (correctly) did not enter judgment, as its dismissal did not

11

include all claims against all defendants. *See Bolden v. Westamerica Mortg. Co.*, No. 97 C 4476, 1999 WL 183762, at \*2 (N.D. Ill. Mar. 25, 1999) ("In dismissing [plaintiff's] claims with prejudice against most of the defendants, we did not dispose of all of the claims against all of the parties, and so no final judgment or order has been entered"). Even if the Court had entered judgment after it dismissed Plaintiff's failure to accommodate with prejudice, Rule 15 would not apply. Rule 15 applies only where "the district court enters judgment at the same time it *first* dismisses a case." *O'Brien v. Vill. of Lincolnshire*, 955 F.3d 616, 629 (7th Cir. 2020) (emphasis added). Plaintiff had at least three opportunities to amend his complaint after Defendant raised the argument that his failure to accommodate claim was time-barred. (Dkt. 21, 32, 67), and the Court dismissed Plaintiff's failure to accommodate claim without prejudice in its first dismissal order. (Dkt. 106.)

Instead of Rule 15, the law of the case doctrine usually applies where, as here, a Plaintiff seeks to reinstate a claim that the Court has dismissed with prejudice. *See, e.g., Tuhey v. Ill. Tool Works Inc.*, No. 17-cv-03313, 2019 WL 1239799, at \*2 (N.D. Ill. Mar. 18, 2019) (dismissal with prejudice order is subject to law of the case doctrine); *Hatcher v. Bd. of Trustees of S. Ill. Univ.*, No. 13-CV-407-NJR-SCW, 2014 WL 5420206, at \*1 (S.D. Ill. Oct. 24, 2014) (same). That said, the law of the case doctrine is discretionary, not mandatory, as in a situation where the Court enters a final judgment of dismissal. *Contrast Runnion*, 786 F.3d at 521 ("when a district court has entered a final judgment of dismissal, the plaintiff cannot amend under Rule 15(a) unless the judgment is modified, either by the district court under Rule 59(e) or 60(b),

12

or on appeal") *with United States v. Harris*, 531 F.3d 507, 513 (7th Cir. 2008) ("the law of the case doctrine is a discretionary doctrine that does not limit the district court's power to reopen what already has been decided"). Accordingly, given that the Court has contributed to some of the confusion regarding the proper standard of review, the Court will analyze Plaintiff's motion under both the standard for reconsideration and the standard for leave to amend.

2.      Reconsideration

Plaintiff has not satisfied his burden under the standard for reconsideration. A motion for reconsideration "serve[s] a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Publishers Resource, Inc. v. Walker-Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985); *see also Minch v. City of Chicago,* 486 F.3d 294, 301 (7th Cir. 2007) ("the law of the case doctrine embodies the notion that a court ought not to re-visit an earlier ruling in a case absent a compelling reason, such as manifest error or a change in the law, that warrants re-examination").

Plaintiff does not contend the Court made any error of law or fact, or that an intervening change of law occurred. Rather, Plaintiff contends newly discovered evidence—Defendant's internal communications, deposition testimony from Defendant's employees, and communications between Defendant's employees and Plaintiff's doctor produced in discovery—warrants reconsideration of the Court's previous dismissal order. (Dkt. 132; Dkt. 136.) According to Plaintiff, this evidence shows Defendant led Plaintiff and his doctor to believe that Defendant was still

13

considering Plaintiff's accommodation request after Defendant's September 28, 2012 letter denying his request. (Dkt. 132 at 7-8.) Plaintiff asks the Court to reconsider its holding that the 300-day clock for filing an EEOC charge began to run on September 28, 2012 because, after that date, Defendant "was indicating to Plaintiff and to his doctor that more information could be provided and that the committee would review the request." (*Id.* at 8.) Thus, "any request for documentation and information from Plaintiff [after September 28, 2012] intentionally caused confusion as to when his accommodation had been firmly denied." (*Id.*) Alternatively, Plaintiff argues the post-September 28, 2012 communications from Defendant constituted "continuing violations" that tolled the 300-day deadline. (*Id.*)

This evidence is insufficient to modify the Court's previous order. Even assuming the evidence says what Plaintiff says it does, it is not "newly discovered." For the purpose of assessing a motion for reconsideration, evidence is "newly discovered" if it "was both previously unknown and if reasonable diligence could not have uncovered such evidence." *Craft v. Flagg*, No. 06 C 1451, 2010 WL 5363914, at *1 (N.D. Ill. Dec. 13, 2010). Plaintiff's "confusion" resulting from what Defendant was "indicating" was known to Plaintiff long before discovery began. For example, Plaintiff claims "based upon newly produced documents, it was . . . discovered that Plaintiff and [Defendant's employee] had an in[-]person meeting on October 19, 2012." (Dkt. 132 ¶ 26.) It is hard to see how any sentient person could "newly discover" that he personally attended a meeting. *See Ramada Franchise Sys., Inc. v. Royal Vale Hosp. of Cincinnati, Inc.*, No. 02-cv-01941, 2004 WL 2966948, at *2 (N.D. Ill. Nov. 24,

2004) (events in which party "personally participated" are "not information otherwise unavailable that only came from [the opposing party] during discovery"). So too for conversations between Defendant and Plaintiff's doctor, which were either "previously []known" to Plaintiff, or at the very least, could (should) have been uncovered by "reasonable diligence." *Craft*, 2010 WL 5363914, at *1; *see also Sigsworth v. City of Aurora, Ill.*, 487 F.3d 506, 512 (7th Cir. 2007) (motion for reconsideration "is not properly utilized to advance arguments or theories that could and should have been made before the district court rendered a judgment").

To circumvent this flaw, Plaintiff urges the Court to consider Defendant's post-September 28, 2012 communications "in the larger context of other newly produced evidence" that shows Defendant "had decided before even receiving all the pertinent information that it would deny Plaintiff's request" for accommodation. (Dkt. 132 at 8.) Assuming Defendant did resolve to deny the request before September 28, 2012, that would not warrant reconsideration. The 300-day limitations period does not begin to run when an employer decides to take an adverse employment action. It "runs from when an employee is notified of an adverse employment decision." *Dugan v. Ball State Univ.*, 815 F.2d 1132, 1134 (7th Cir. 1987) (citing *Del. State College v. Ricks*, 449 U.S. 250 (1980)). As this Court previously held, the September 28, 2012 letter notified Plaintiff that Defendant had unequivocally denied his accommodation request. Whether the decisionmakers made up their minds before that date is beside the point. Plaintiff's evidence, therefore, does not warrant reconsideration.

### 3.   Leave to Amend

Plaintiff also has not met his burden for allowing leave to amend. District courts "have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 582 (7th Cir. 2019) (emphasis omitted). Plaintiff repeatedly failed to cure the deficiencies he now seeks to address in his proposed amended complaint despite multiple opportunities to do so. Defendant raised the argument that Plaintiff's claims were time-barred in three separate motions to dismiss before his failure to accommodate claim was dismissed on that basis. (*See* Dkt. 21 at 5; Dkt. 32 at 4-5; Dkt. 67 at 4.) And, as discussed above, Plaintiff either personally participated in (or should have known about) the events he now alleges save his claim. This is enough to deny him leave to amend. *See Ramada Franchise Sys., Inc.*, 2004 WL 2966948, at *2 (denying leave to amend pleading to add claims regarding events in which party "personally participated" because "there is no reason . . . why . . . counsel could not have 'discovered' this information by simply discussing this case with his clients"); *Howard-Ahmad v. Chicago Sch. Reform Bd. of Trustees*, No. 99-cv-04687, 2001 WL 197852, at *2 (N.D. Ill. Feb. 27, 2001) ("newly discovered information that may justify an untimely motion to amend the complaint is information that could not have reasonably been discovered any earlier").

Worse still, the core deficiencies in Plaintiff's complaint *remain* uncured. *See MAO-MSO Recovery II, LLC*, 935 F.3d at 582 (district courts may deny motions for leave to amend under Rule 15 "where the amendment would be futile"). In its order dismissing Plaintiff's failure to accommodate claim as time-barred, the Court noted that "Plaintiff followed an established process in his first and second accommodation requests where [Plaintiff] himself would submit a written accommodation request to the CTA stating that the requested accommodation and the reason, while Dr. Schilling would submit letters in support of the request." (Dkt. 106 at 8.) Based on this established process, the Court found that Plaintiff's September 24, 2012 request for accommodation was the most recent request Plaintiff alleged remained outstanding after September 28, 2012. (Dkt. 106 at 7.) Because the September 28, 2012 letter unequivocally denied the September 24, 2012 request, the Court held that the 300-day clock began running on that date. (*Id*.)

Nothing in the proposed amended complaint changes this analysis. Plaintiff alleges there was mixed messaging from Defendant regarding his options for appealing the September 28, 2012 denial, but Plaintiff does not allege that he in fact appealed that decision, or that he made another formal request for accommodation following the established procedures for doing so. Accordingly, this Court's previous analysis of the currently operative complaint applies to the proposed amended complaint as well.

During oral argument, Plaintiff's counsel suggested three newly-discovered documents establish that Plaintiff's failure to accommodate request remained

outstanding beyond September 28, 2012: (1) an October 19, 2012 email that purportedly shows Cobb met with Plaintiff that day (Dkt. 132-10; *see also* Dkt. 132 ¶ 26; Dkt. 157-31); (2) a copy of an October 29, 2012 email from Dr. Schilling to Cobb to which Cobb affixed a post-it note describing a call she had with Dr. Schilling (Dkt. 157-28); and (3) an August 31, 2012 email Cobb sent to herself regarding Plaintiff's accommodation requests (Dkt. 157-17).

These documents do not disturb the Court's previous reasoning. The email noting Cobb's October 19, 2012 meeting with Plaintiff says nothing about the substance of the meeting and thus falls short of establishing that Plaintiff made a new accommodation request at that time. And the October 29, 2012 email from Dr. Schilling says only that Plaintiff requested another letter from Dr. Schilling; it does not say that Defendant demanded such a letter, much less that Plaintiff submitted a new accommodation request to Defendant following the established procedure for doing so. Finally, although Plaintiff asserts the newly-produced August 31, 2012 email Cobb sent to herself shed new light on the meaning of her October conversations with Plaintiff and Dr. Schilling, the Court is not convinced that email has any bearing on the issue of whether Plaintiff made an accommodation request after September 28, 2012.

In sum, the Court's reasoning in its previous motion to dismiss opinion applies with equal force to the proposed amended complaint. Plaintiff's proposed amendment is futile; and leave to amend should thus be denied. *Sigsworth*, 487 F.3d at 512

(affirming denial of leave to amend where amendment was futile because plaintiff's proposed additional allegations would not overcome the initial motion to dismiss).

**B.      Defendant's Motion for Summary Judgment**

Defendant moves for summary judgment with respect to Plaintiff's ADA retaliation and interference claims. In its motion, Defendant argues that Plaintiff has not created a triable issue of fact regarding either claim. (Dkt. 147.)

1.      <u>Standard of Review</u>

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the nonmoving party. *Scott*, 550 U.S. at 378. But "[a]s the 'put up or shut up' moment in a lawsuit, summary judgment requires a [nonmoving] party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted).

2.    <u>Retaliation</u>

Under the ADA, an employer is prohibited from taking an adverse employment action "because [plaintiff] has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the ADA. 42 U.S.C. § 12203. There are two "methods" for making a *prima facie* ADA retaliation case: the "direct" method and the "indirect" method. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018).

Plaintiff does not specify whether he is pursuing the direct or indirect method. Under the indirect method, however, a plaintiff must show "he was treated less favorably than similarly situated employees who did not engage in protected activity." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Plaintiff does not identify any similarly situated employees—meaning that the direct method is the only one left available to Plaintiff.

A plaintiff pursuing the direct method must show: (1) the plaintiff engaged in a statutorily protected activity; (2) the plaintiff suffered an adverse employment action; and (3) there is a causal connection between the two events. *Guzman v. Brown Cnty.*, 884 F.3d 633, 642 (7th Cir. 2018). Importantly, although the Court will distinguish between the direct and indirect *method*, the Court will not distinguish between direct and indirect *evidence*. *See Ortiz v. Werner Enters.*, 834 F.3d 760, 765 (7th Cir. 2016). The standard "is simply whether the evidence would permit a

reasonable factfinder to conclude that" retaliation "caused the discharge or other adverse employment action." *Id.*

A reasonable factfinder could perhaps conclude that Defendant denied Plaintiff's reasonable accommodation request. Defendant accepted a note from Dr. Schilling and agreed to schedule Plaintiff's shifts to accommodate his needs. (PSOAF ¶ 16; Def. Resp. PSOAF ¶ 16; DSOF Ex. Q.) But Defendant failed to live up to the terms of its agreement and then refused to renew it, claiming a nearly identical note from Dr. Schilling "d[id] not support [his] accommodation request." (PSOAF ¶¶ 17, 47-48, Ex. 29; Def. Resp. PSOAF ¶¶ 17, 47-48.) All the while, CTA brass remained skeptical of Plaintiff's request and his motivation for bringing it. (PSOAF ¶¶ 2, 24; 27, Ex. 13, 19; Def. Resp. PSOAF ¶¶ 2, 24, 27.) In the absence of any reasonable basis for denying Plaintiff's request, there may be enough evidence to create a triable issue of fact regarding whether Defendant failed to accommodate Plaintiff in violation of 42 U.S.C. § 12112.

For the reasons stated above, however, Plaintiff's failure to accommodate claim has been dismissed as untimely. And courts "do not recognize ADA retaliation claims that are simply repackaged failure to accommodate claims. If they did, almost every failure to accommodate claim would be simultaneously a retaliation claim. . . ." *Koty v. Zaruba*, No. 15-cv-02600, 2017 WL 4150684, at *7 (N.D. Ill. Sept. 19, 2017), *aff'd sub nom. Koty v. DuPage Cnty., Ill.*, 900 F.3d 515, 519-20 (7th Cir. 2018). Plaintiff contends his termination, not Defendant's refusal to modify his schedule, was retaliatory. This Court must therefore ask whether Plaintiff has created a triable

issue regarding only the termination.

To show retaliation, Plaintiff must show Defendant "would not have taken the[] adverse employment action[] but for his" protected activity; "proof of mixed motives will not suffice." *Hillmann v. City of Chicago*, 834 F.3d 787, 795 (7th Cir. 2016) (quotations omitted). In other words, "retaliation must be a but-for cause of a materially adverse action, not merely a contributing factor." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 455 (7th Cir. 2011). Because of this, "[c]ausality is typically one of the highest hurdles retaliation plaintiffs must clear." *Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 665 (7th Cir. 2011). Crucially, "in a retaliation case, it is not enough that the decisionmaker should have known about" the protected conduct; the decisionmaker "must have had actual knowledge of the [protected conduct] for her decision to be retaliatory." *Hayes v. Potter*, 310 F.3d 979, 982-83 (7th Cir. 2002); *see also Maarouf v. Walker Mfg. Co., Div. of Tenneco Auto., Inc.*, 210 F.3d 750, 755 (7th Cir. 2000) ("At this stage of the proceedings on summary judgment, [plaintiff] need not prove by a preponderance of the evidence that [the decisionmaker] was aware of his discrimination complaint, but he must at least produce evidence that would support an inference that [the decisionmaker] was so aware").

Plaintiff attempts to show retaliation through (1) evidence those who terminated his employment were motivated by retaliatory animus; (2) evidence lateness was a mere pretext for the termination decision; and (3) evidence that the timing of his firing was suspicious. In accordance with the Seventh Circuit's mandate, the Court will evaluate this evidence "in a single pile . . . as a whole." *Ortiz*, 834 F.3d

at 766. But for the sake of organization, the Court will address each of the three categories of evidence in turn.

a.    *Evidence of Retaliatory Animus*

Plaintiff has not presented evidence from which a reasonable factfinder could conclude his firing was motivated by retaliatory animus. *See Davis v. Brennan*, No. 14 C 753, 2016 WL 5476251, at *2 (N.D. Ill. Sept. 29, 2016) ("the *Ortiz* reasonable factfinder method" requires a plaintiff to present "sufficient evidence to show that a reasonable factfinder could 'conclude that the plaintiff's [protected conduct] caused the . . . adverse employment action.'") (quoting *Ortiz*, 834 F.3d at 764). Plaintiff admits Fitzgerald, following Lachowicz's recommendation, fired him. (DSOF ¶¶ 70-71; Pltf. Resp. DSOF ¶¶ 70-71.) Yet Plaintiff's arguments in opposition to Defendant's motion do not address what Lachowicz or Fitzgerald knew about his requests for accommodation before they decided to fire him. Lachowicz placed Plaintiff on probation *before* there was any conflict about Plaintiff's accommodation. (DSOF ¶ 51; Pltf. Resp. DSOF ¶ 51.) And Lachowicz told Plaintiff that an additional miss during the probationary period could result in referral to Fitzgerald for discharge consideration. (DSOF ¶ 55; Pltf. Resp. DSOF ¶ 55.) Accordingly, there is insufficient evidence from a which a reasonable factfinder could conclude Lachowicz knew about the accommodation request for which he supposedly retaliated.

So too for Fitzgerald. There is no evidence (Plaintiff cites none) that Fitzgerald knew about the accommodation request before he decided to fire Plaintiff. To the contrary, Plaintiff admits that Fitzgerald did not mention his accommodation request

until Plaintiff brought it up. (DSOF Ex. C at 270:11-272:24.) In response, Fitzgerald told Plaintiff there was nothing he could do about the request and that the reason for the termination was Plaintiff's lateness. (*Id.*)

Without evidence that either Lachowicz or Fitzgerald knew about the accommodation request, a reasonable factfinder could not conclude there was a causal link between Plaintiff's requests for accommodation and the termination decision. *See Guzman*, 884 F.3d at 643 (where decisionmaker "was unaware of [plaintiff's] asserted need for an accommodation when he decided to fire" plaintiff, she "cannot establish a causal link between her request for accommodations and her subsequent termination."); *Maarouf*, 210 F.3d at 755; *Hayes*, 310 F.3d at 983.

Lacking any evidence showing Lachowicz or Fitzgerald sought to retaliate, Plaintiff's papers focus heavily on Jackson and Morris. (Dkt. 158; PSOAF ¶¶ 2, 24; 27.) Plaintiff argues, without evidence, that Jackson and Morris directly made the decision to terminate him. (Dkt. 158 at 14.) But although Plaintiff's Rule 56 statement is replete with factual assertions regarding the role Jackson and Morris played in the decision to deny his accommodation request, there are no factual assertions regarding their role in the termination decision. Any retaliatory animus they may have harbored is therefore inapposite. *See Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 443 (7th Cir. 2009) (statements evidencing retaliatory intent "had little probative value since they were not comments of the decision-maker himself") (citing *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 986 (7th Cir.

24

2001) ("Statements by a non-decision-maker that amount to mere speculation as to the thoughts of the decision-maker are irrelevant to an inquiry of discrimination.")).

In the alternative, Plaintiff contends that, even if Jackson and Morris were not themselves the decisionmakers, they influenced the decisionmakers (Lachowicz and Fitzergald). (Dkt. 158 at 14 ("Mr. Jackson and Ms. Morris were directly involved in deciding not to grant Plaintiff his accommodation and for his subsequent discharge").) At oral argument, counsel elaborated that the Court should infer that Fitzgerald learned of Plaintiff's request for accommodation from Jackson because the two worked closely together after Fitzgerald filled Jackson's old post as General Manager of the Kedzie Garage.

Because the inference that Jackson influenced Fitzgerald is speculative and unsupported by record evidence, the Court cannot draw it. *See McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) ("Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion"); *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016) ("Our favor toward the nonmoving party does not extend to drawing inferences that are supported only by speculation or conjecture. . . . Plaintiffs must come forward with specific facts showing that there is a genuine issue for trial"); *Gunville v. Walker*, 583 F.3d 979, 986 (7th Cir. 2009) (Plaintiffs cannot defeat summary judgment with mere "speculation and innuendo"). Plaintiff's Rule 56 statement is devoid of facts connecting Fitzgerald to Jackson. Indeed, Plaintiff has not identified in his summary judgment papers any document, line of testimony, or other category of evidence that

suggests Jackson and Fitzgerald worked closely together or talked to each other about Plaintiff—much less that they conspired to fire him. In the absence of such evidence, the Court cannot infer that Fitzgerald shared Jackson's knowledge of (or attitude toward) Plaintiff's accommodation requests. *See Riley v. City of Kokomo*, 909 F.3d 182, 191 (7th Cir. 2018) (affirming grant of summary judgment because "insofar as [plaintiff] posits that [a nondecisionmaker] harbored animus against her because of her disability, there is no evidence that [he] took part in the termination decision").

Even assuming Jackson and/or Morris played a role in the termination decision, however, Plaintiff has failed to create a triable issue as to whether even they harbored retaliatory animus. Plaintiff relies on an email in which Jackson describes Plaintiff's accommodation request as a "plot" (PSOAF Ex. 25), as well as other emails that purportedly show Morris and Jackson were suspicious of Plaintiff's accommodation request and keen to deny it. (PSOAF ¶¶ 2, 24; 27, Exs. 13, 19.) But skepticism does not equal retaliation. And merely that an employer doubts a disability claim, or questions whether an employee is acting in good faith, is not enough for a retaliation claim to survive summary judgment. *See Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 497 (7th Cir. 2014) (affirming grant of summary judgment where an "employer, faced with accountability problems, simply discussed whether it ought to exercise a statutory right under the FMLA and seek verification that the request for leave was legitimate").

*Taylor-Novotny* is instructive. An employee with multiple sclerosis who had requested ADA accommodations and FMLA leave was fired for repeated tardiness.

*Id.* at 495. Claiming that the employer's reliance upon tardiness was pretextual, the plaintiff alleged that retaliation was instead the real reason for her firing. *Id.* She cited the timing of her termination as well as an email from the defendant's Vice President of Employee Relations stating that the employee was "getting whatever she asks for from her physician" and that the employer had the "feel[ing] that she is taking advantage of the situation." *Id.* at 496. Despite this evidence, the district court granted summary judgment for the defendant on all claims. *Id.* at 482.

Affirming summary judgment, the Seventh Circuit held that while the email was "perhaps suggestive of irritation or doubt" regarding Plaintiff's medical needs, it could not support a claim when "evaluated in context." *Id.* at 496. Specifically, the Court noted that "[t]he focus of the email is [plaintiff's] need for, and possible abuse of, FMLA leave," which is a "reasonable business concern of an employer." *Id.*

That same reasoning applies here. Jackson and Morris's emails certainly suggest they doubted the veracity of Plaintiff's need for accommodation, but they were within their rights to be skeptical. The ADA does not require employers to have blind faith in their employees. And that Defendant may have prejudged Plaintiff's request for accommodation—while perhaps probative of a refusal to accommodate claim—does not raise the further inference that Defendant sought to fire Plaintiff for having had the audacity to make the request in the first place.

b.    *Evidence of Pretext*

Lacking evidence of a decisionmaker's retaliatory animus, Plaintiff seeks to create a factual issue regarding the "miss" that effected his termination. Plaintiff

suggests that, if he can prove he was not late on November 23, 2012, there was no reason for his firing other than retaliation. (Dkt. 158 at 12-14); *see Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999) ("Pretext may be established directly with evidence that [the employer] was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible") (citing *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1039 (7th Cir. 1993)).

Plaintiff's argument falls short here as well. Because there is no federal cause of action for mistaken termination, Plaintiff needs to create more than a triable issue regarding whether he was on time to work: rather, he must instead show there is a genuine dispute regarding whether Defendant used a false accusation of lateness as a pretext for a retaliatory firing. *See Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010) ("Evidence offered under the direct method 'must allow a jury to infer more than pretext; it must itself show that the decisionmaker acted because of the prohibited animus' ") (quoting *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003)); *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (affirming grant of summary judgment because, "even if [plaintiff] could show . . . pretext, there is no evidence from which a jury could find that was pretext *for retaliation*") (emphasis in original); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("a reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason") (emphasis and internal quotations omitted). Plaintiff has presented some evidence

that he was on time that day. But he has not, as he must, presented any evidence that Defendant contrived lateness as pretext for a retaliation.

Moreover, Plaintiff has failed to create a genuine issue of fact even as to whether he was late. *See Baron v. City of Highland Park*, 195 F.3d 333, 337–38 (7th Cir. 1999) ("Only genuine disputes over material facts can prevent a grant of summary judgment. . . .") (cleaned up) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Plaintiff submits an affidavit in support of summary judgment that states, in relevant part:

> I reported to work on November 23, 2012 in a timely manner. While the Tap Time provided by Defendant indicates I reported to work at 6:42 a.m., in fact I arrived prior to the start time of 6:30 a.m. I checked in with the clerk after reporting for work and, after waiting, the clerk asked me if I wanted to elect not to work that day. I took the Clerk up on her offer not to work that day and went home. When I left, I tapped the machine on my way out. I believe that was the 6:42 a.m. time the Time Tap reflected. Moreover, the Tap Time machine did not always function correctly, a problem that was well-known and common by the bus operators and those of authority at the CTA.

(Dkt. 160.) Although this averment does not explain why Plaintiff would have done so, it suggests that Plaintiff tapped the machine on his way out but not his way in. Plaintiff's deposition testimony, however, is clearer: for there, Plaintiff stated (as his

counsel confirmed at oral argument) that Plaintiff contends he did tap in before 6:30 a.m.:

> Q: Are you saying that you did not tap
> in at 6:42 a.m. on November 23rd, 2012?
> A: I'm not saying that. I'm stating
> that I tapped the card at 6:42, but it's not
> showing the time that I tapped in.
> Q: What time did you tap in?
> A: Before 6:30.

(DSOF Ex. C at 257:3-7.) To credit this testimony, the factfinder would have to conclude that Defendant's electronic time entry system malfunctioned by registering one tap but not another. But aside from Plaintiff's conclusory allegation that the machine malfunctioned frequently, there is no other evidence in the record that the Tap Time system was generally unreliable or that it malfunctioned in *this* incident. As Defendant points out, Plaintiff's bare assertion that the Tap Time machine was unreliable is not enough to create a factual issue at this stage. *See Smith v. Sebelius*, 484 F. App'x 38, 41 (7th Cir. 2012) (nonprecedential disposition) (affirming grant of summary judgment where plaintiff "submitted nothing to substantiate that she was in fact working during the times her pass-card records indicate she was out of the office"); *King*, 872 F.3d at 840 (affirming grant of summary judgment where plaintiff "argue[d] that her burden [wa]s lightened because [defendant's] [time] records [we]re unreliable"; the "bare assertion in her affidavit would not meet any burden, no matter how light") (citing *Melton v. Tippecanoe Cnty.*, 838 F.3d 814, 818-19 (7th Cir. 2016) (plaintiff who "call[s] into question the accuracy of the [employer's] [time] records"

must "produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference")).

c.     *Evidence of Suspicious Timing*

Without evidence showing retaliatory intent or pretext, Plaintiff's case is too thin to proceed beyond the summary judgment stage. Plaintiff's only remaining category of evidence is the timing of his termination. (Dkt. 158 at 9-10.) Plaintiff points out that CTA fired him fewer than three months after the SAR was denied and with three weeks remaining in his probationary period. (*Id.*) This is not enough. As the Seventh Circuit has repeatedly explained, "On summary judgment, in particular, 'it is clear mere temporal proximity is not enough to establish a genuine issue of material fact.' " *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (quoting *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004)).

Further, Plaintiff was disciplined for lateness before he made his first accommodation request. (PSOAF ¶ 11, Ex. 3; Def. Resp. PSOAF ¶ 11.) Plaintiff also was disciplined for lateness on three other occasions and placed on probation before the second request was denied. (DSOF ¶¶ 11, 39, 43, 46, 51; Pltf. Resp. DSOF ¶¶ 11, 39, 43, 46, 51.) In the context of these undisputed facts, Plaintiff's termination more than two months after his request was denied and with more than one month remaining in his six-month probationary period cannot save Plaintiff's retaliation claim from summary judgment. *Cf. Benuzzi*, 647 F.3d at 666 ("two-month time frame separating [plaintiff's] first amended EEOC complaint and her second suspension is, without more, insufficient to give rise to" an inference of discrimination) (citing

*Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) ("The approximate seven-week interval between [plaintiff's] sexual harassment complaint and her subsequent arrest/termination does not represent that rare case where suspicious timing, without more, will carry the day.")).

### 3.    Interference

Plaintiff's third count alleges Defendant interfered with Plaintiff's exercise of his ADA rights. It is, of course, unlawful under the ADA for an employer to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on the account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by" the ADA. 42 U.S.C. § 12203(b). The elements of an ADA interference claim are: (1) plaintiff engaged in activity statutorily protected by the ADA; (2) plaintiff was engaged in the exercise or enjoyment of ADA protected rights; (3) defendant coerced, threatened, intimidated, or interfered on account of his protected activity; and (4) the defendant was motivated by an intent to discriminate. *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550-51 (7th Cir. 2017).

As with his retaliation claim, Plaintiff fails to establish a triable issue of fact on this claim. In brief, Plaintiff argues that his termination was merely the *coup de grâce* of CTA's misconduct and that, before the termination, CTA (1) capriciously declared him unfit for duty on two occasions; (2) prejudged the SAR and devised a false reason for denying it; (3) subjected him to multiple requests for medical information while having no intention of granting the SAR. (Dkt. 158 at 7.)

These facts could constitute evidence that CTA unreasonably denied Plaintiff's accommodation requests. But because the incidents occurred more than 300 days before Plaintiff filed his EEOC charge, none of these facts can serve as predicates for Plaintiff's interference claim unless Plaintiff can show they are "related closely enough to the [termination] such that they are to be considered one ongoing violation." *Koelsch v. Beltone Elec. Corp.*, 46 F.3d 705, 707 (7th Cir. 1995) (explaining the requirements of the "continuing violation doctrine"). As discussed above, the request for accommodation was not denied by the same people who made the termination decision. Plaintiff has provided no evidence linking these decisions; he therefore has not satisfied his burden to show that the continuing violation doctrine applies. *Cf. Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 807 n. 8 (7th Cir. 1999) (declining to apply ongoing violation doctrine to time-barred predicate acts that "implicate other decisionmakers and involve other kinds of employment decisions"); *Grayson v. City of Chicago*, 317 F.3d 745, 751 (7th Cir. 2003) (plaintiff's theory that his claim was "defeated by a discriminatory series of personnel actions that effectively cloaked the identity of the decisionmaker" was not sufficient to survive summary judgment absent evidence that "ha[d] in fact occurred").

Even if the Court considered Defendant's pre-September 28, 2012 conduct, it would not support an interference claim. As to the fitness for duty determinations, Plaintiff was aware he would be subject to a fitness determination as part of the transition from part-time to full-time. (DSOF ¶ 56, Ex. C, 199:13-16, 200:5-13; Ex. CC.). And although Plaintiff makes much of his allegation that he was capriciously

deemed unfit at two points in August and September 2012, he admits that status lasted only eleven work-days before Defendant accepted his physician's note and reinstated him. (PSOAF ¶¶ 29, 31, 34, 46.) This is not enough to support an interference claim. *Shaw v. Williams*, No. 16-CV-1065, 2018 WL 3740665, at *11 (N.D. Ill. Aug. 7, 2018) (interference requires "a pattern of harassment . . . invidiously motivated"); *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009) ("Interference is more than . . . an isolated act of discrimination") (quotations omitted).

Moreover, Plaintiff's litany of grievances regarding Defendant's denial of the SAR is little more than a rehash of his time-barred failure to accommodate claim. For the same reasons these arguments are insufficient to establish retaliation, they are insufficient to establish interference. *See Olian v. Bd. of Educ. of City of Chicago*, 631 F. Supp. 2d 953, 966 (N.D. Ill. 2009) (to allege a claim of interference under Section 12203(b), a plaintiff must meet the same requirements as necessary to assert a claim for retaliation under Section 12203(a)) (citing *Silk v. City of Chicago*, 194 F.3d 788, 799 (7th Cir. 1999)).

Finally, although Plaintiff complains he "was harassed and subjected to repeated, unnecessary medical examinations" (Dkt. 158 at 9), Plaintiff's submissions show only that Defendant asked Plaintiff questions about his medical status on a small number of occasions in August and September 2012. (*Id.* at ¶ 18 (citing PSOAF ¶¶ 18-20).) Without any other evidence Defendant's requests for medical information crossed the line from diligence to interference, no reasonable factfinder could

conclude this amounted to "a pattern of harassment, invidiously motivated." *Shaw*, 2018 WL 3740665, at *11.

## IV.    CONCLUSION

In resolving these motions, the Court recognizes both that Plaintiff might have been able to create a triable issue regarding his failure to accommodate claim were it not time-barred and that Defendant committed a significant discovery violation. But the limitations period is governing law, and this Court has already sanctioned Defendant for its discovery misconduct (and Plaintiff has now had the opportunity for full discovery). There is no basis to reconsider the dismissal of the failure to accommodate claim, there is no genuine issue of material fact regarding Plaintiff's remaining claims, and Defendant is entitled judgment as a matter of law. Accordingly, Plaintiff's motion for reconsideration is denied, and Defendant's motion for summary judgment is granted.

SO ORDERED.

Date: March 30, 2021                    _____
                                        JOHN F. KNESS
                                        United States District Judge